**ROY GLADEN BUICK, INC., Appellant,**

v.

**St. Peter STERLING, Appellee.**

**No. 5449.**

Court of Civil Appeals of Texas, Waco.

June 26, 1975.

Rehearing Denied July 17, 1975.

Nall, Harrison & Nall, Sherman, for appellant.

Geary, Brice, Barron & Stahl, Gerald P. Urbach, David A. Coggin, Dallas, Weisberg & Weisberg, Denison, for appellee.

## OPINION

JAMES, Justice.

This is a case involving the conversion of an automobile, growing out of the sale of an automobile by a dealer to a customer. The trial court based upon a jury verdict awarded actual and exemplary damages to Plaintiff-Appellee Sterling (the customer) against Defendant-Appellant Roy Gladen Buick, Inc., (the dealer) from which the dealer appeals. We affirm.

Plaintiff-Appellee Sterling sued Defendant-Appellant dealer, alleging breach of contract for the sale of an automobile to Plaintiff and that Defendant converted said automobile by taking it from Plaintiff after the sale. Plaintiff sued for actual damages, and exemplary damages based upon the alleged wilful and malicious actions of Defendant. The jury verdict was favorable to Plaintiff Sterling, and based upon same the trial court entered judgment for Plaintiff against Defendant for $845.00 actual damages, plus interest, and $5000.00 exemplary damages.

By their answers to the special issues the jury found some facts and failed to find other facts. The facts found by the jury are as follows:

(1) On May 15, 1971, Plaintiff Sterling offered to purchase the 1970 Buick from Roy Gladen Buick, Inc., for $1400.00 plus the trade-in of his 1969 Chevrolet Impala automobile;

(2) Roy Gladen Buick, Inc., acting through its agents, servants, and employees, on May 15, 1971, accepted Plaintiff's offer as stated in (1) hereinabove;

(2A) A. D. Lummus, the salesman working for the dealer, had the apparent authority to make the above agreement with Plaintiff for the sale of the 1970 Buick in question;

(3) On May 15, 1971, Roy Gladen Buick, Inc., acting through its agents, servants or employees orally agreed that Plaintiff could pay the balance owing on the 1970 Buick in question on Monday, May 17, 1971;

(4) On May 15, 1971, the Defendant dealer, acting through its agents, servants, or employees, orally agreed that it would deliver title of the 1970 Buick to Plaintiff on Monday, May 17, 1971;

(5) On Monday, May 17, 1971, Defendant dealer refused to deliver title of the 1970 Buick to Plaintiff:

(6) On Monday, May 17, 1971, Plaintiff offered to pay the balance ($1400.00) owing on the 1970 Buick to Defendant dealer;

(7) On Monday, May 17, 1971, Defendant dealer refused to accept payment by Plaintiff of the $1400.00 balance owing on the 1970 Buick;

(8) Plaintiff Sterling was in possession of the 1970 Buick on Wednesday, May 19, 1971;

(9) On Wednesday, May 19, 1971, Roy Gladen took the 1970 Buick from the possession of Plaintiff Sterling;

(9A) That Roy Gladen converted the 1970 Buick to the use of Defendant Roy Gladen Buick, Inc.;

(10) That at the time of such taking, Roy Gladen was acting in furtherance of the business of Roy Gladen Buick, Inc.;

(11) The reasonable market value of the 1969 Chevrolet Impala (traded in by Plaintiff) in Grayson County, Texas, on or about May 19, 1971, was $1650.00;

(12) Such taking of the 1970 Buick from Plaintiff's possession was done wilfully and maliciously. In this connection the trial court gave to the jury the following definition: "By the term 'wilfully and maliciously' is meant the intentional doing of a wrongful act without just cause or excuse; that is, if a wrongful act is intentionally done without just cause or excuse for believing it to be right or legal, or done with conscious disregard to the rights of others, then such act is wilfully or maliciously done. Wilfulness and intent may be inferred by the actions and conduct of the wrongdoer."

(13) Plaintiff Sterling should be awarded exemplary damages in the amount of $5000.00.

(24) The contract price at which Defendant dealer sold the 1970 Buick to Paul Anderson was $3504.00.

The jury failed to find as follows to the following special issues:

(14) They failed to find that on or about May 15, 1971, Plaintiff Sterling represented to Roy Gladen Buick, Inc., its officers, agents or employees that he had purchased the 1969 Chevrolet Impala as a new automobile;

(18) They failed to find that on or about May 15, 1971, Plaintiff Sterling represented to Defendant dealer, its officers, agents or employees, that he had a new car warranty on the 1969 Chevrolet Impala automobile;

(22) They failed to find that the agreement by Defendant to make the sale in question was conditioned upon Plaintiff Sterling delivering a new car service warranty; and

(23) They failed to find that after Defendant took possession of the 1970 Buick automobile, that it (Defendant) notified Plaintiff's attorney that said Buick automobile would be held for a reasonable length of time, to be delivered at the same price, during which time it would accept delivery of the Chevrolet automobile, undamaged, provided it was accompanied by a new car warranty or service policy.

As stated above, based upon the above jury verdict, the trial court entered judgment in favor of Plaintiff Sterling against the Defendant for $845.00 actual damages plus interest, and $5000.00 exemplary damages, from which Defendant-Appellant appeals.

Appellant asserts by his points one through five that there is no evidence to support the jury's answers to Special Issues Numbers 12 (that the taking of the car was wilful and malicious) and 13 (that Plaintiff was entitled to $5000.00 exemplary damages). Further, that the jury's answers to Special Issues 12 and 13 were so against the great weight and preponderance of the evidence as to be manifestly unjust. We overrule these contentions.

Plaintiff-Appellee St. Peter Sterling was a black man sixty-five years of age and retired at the time of trial. Prior to his retirement, and at the times material to this controversy he was caretaker of a Methodist Church located in Denison, Texas. He had had a fifth grade education.

Defendant-Appellant Roy Gladen Buick, Inc., is a Buick retail dealership located at Sherman, Texas, headed by Roy Gladen, its president.

At times material to this controversy Plaintiff Sterling was the owner of a 1969 Chevrolet Impala automobile. About two weeks before May 15, 1971, Sterling went to Defendant dealership and made an effort to purchase a 1970 gray Buick which Defendant then had in stock. Plaintiff at that time talked to Roy Gladen, and tried to trade his Chevrolet for the 1970 Buick. The matter ended when Roy Gladen offered to sell him the Buick for Sterling's Chevrolet and $2195.00 difference. Sterling thought this was too much difference to pay and did not buy the Buick.

Then on Saturday, May 15, 1971, Plaintiff Sterling came back to Defendant dealership and tried to buy a different 1970 Buick which was similar to the car he had tried to purchase earlier.

On May 15, 1971, Sterling talked to A. D. Lummus, an automobile salesman who had been working for Defendant about three months, and who was not permitted by his employer to appraise automobiles for trade purposes.

After examining Sterling's Chevrolet, Lummus contacted Harry Parks, another salesman who worked for Defendant, and Lummus and Parks both inspected Sterling's Chevrolet and drove it around the block. Sterling offered to trade in his Chevrolet and pay $1400.00 difference for the 1970 Buick. After some bargaining back and forth, Parks told Lummus, in effect: "We've got to sell some cars. Go ahead and sign the man up." Whereupon Lummus filled out and prepared a printed form in triplicate entitled, "Retail Order for a Motor Vehicle," showing Sterling to be the purchaser of the 1970 Buick by trading in his 1969 Chevrolet and paying $1400.00 difference. Sterling signed this form as purchaser and A. D. Lummus signed it as "Dealer or his Authorized Representative," and Sterling was given a copy.

Sterling told Lummus that he wanted the car financed through Associates Finance Service in Denison, Texas, whose manager was O. T. Winters. Sterling's 1969 Chevrolet was currently being financed with Associates, who had his title certificate and other car papers at that time. Winters had financed other cars for Sterling over a period of some twelve to fourteen years.

At Sterling's request Lummus called Winters on the telephone about financing

the 1970 Buick. Winters told Lummus that he would finance the Buick for Sterling; but since it was Saturday, his office was closed and he would not be able to have a check ready for the $1400.00 difference and produce the title papers on Sterling's Chevrolet until the following Monday, May 17, 1971. Lummus arranged with Winters for him and Plaintiff Sterling to meet at Winter's office about 9 A.M., Monday, to complete the deal.

After this, Sterling left in his Chevrolet and went back to Denison. Sterling called Winters on the telephone and verified that Winters would finance the 1970 Buick. Then (this still being Saturday afternoon) Sterling went back to Sherman to the Buick dealership and asked Lummus if it would be all right for him to pick up the Buick and drive it over the weekend, and leave his Chevrolet with them. Lummus agreed, whereupon Sterling left Lummus his Chevrolet and its keys, and Sterling was given the keys to the Buick and drove it back home to Denison.

On this Saturday, May 15, 1971, Lummus agreed to deliver title of the Buick to Sterling on Monday, May 17, 1971, at which time Sterling agreed to pay the $1400.00 difference and deliver the title to the Chevrolet to Defendant, and to accomplish this Lummus and Sterling agreed to meet at the office of Associates Finance Service at Denison, Texas, with Mr. Winters at or about 9 A.M., on said Monday, May 17, 1971.

However, on the morning of Monday, May 17, 1971, Lummus drove the 1969 Chevrolet (that Sterling delivered to him the previous Saturday) up to Denison and went to the church where Sterling was employed, arriving there between 8 and 9 A.M. When Lummus saw Sterling at the church, he asked Sterling for the warranty on the Chevrolet; whereupon Sterling told him he had no warranty. Lummus told him he did not know "whether we're going to go through with the trade or not if you don't have the warranty."

At this point, Lummus and Sterling went to the Associates Finance office and met with Winters, who offered Lummus the check for the difference. Lummus refused to take the check, saying, "Sterling don't have the warranty to this car and I don't think we're going to be able to go through with it." Lummus called to Sherman on Winter's telephone, after which he told Winters, "They're not going to go through with it."

Then after lunch on this same Monday, Lummus and Parks both came back to the church and talked to Plaintiff Sterling, asking Sterling for the warranty on the Chevrolet, and Sterling again told them he had none. Parks said, "Well, you led us to believe that you had it." To this Sterling replied, "No, I did not."

On the morning of the following Wednesday, May 19, 1971, Sterling drove the 1970 Buick to work, and parked it on the Wyatt's Supermarket parking lot. Sterling decided to go see Mr. Eric Weisberg, an attorney, in an effort to get the trade through, and when he went to get his car, he discovered that it was gone. Shortly thereafter Lummus and Parks came to the church and asked Sterling for the keys to the Buick, and Sterling refused to give them up. Parks said, "You mean we're going to have to get the Sheriff to get the keys?" To this Sterling replied, "If you get them you will." Lummus then handed Sterling the keys to the Chevrolet, which Sterling took. Lummus and Parks left the Chevrolet with Sterling, and went away.

After this, on this same Wednesday morning, Plaintiff Sterling contacted Mr. Weisberg, the attorney, who in turn put in a telephone call to Mr. Roy Gladen, but he was at that time away from his place of business. About two hours later, Roy Gladen returned the call to Weisberg. After Weisberg explained the purpose of his call, Gladen at first acted as if he knew nothing about the matter. Then he said, "Oh yes, he's that colored fellow." He then told

Weisberg that they had taken the car and said, "I didn't sell it to him. There was no binding contract. I didn't sign the contract." Weisberg pointed out to him that the contract had been signed by Lummus, one of his salesmen, and the car had been delivered to Sterling. Gladen then said, "Well, what do you want?" Weisberg told him Sterling wanted his car back, to which Gladen replied, "It is not his car and nothing can be done."

Roy Gladen testified that he personally went to Denison and found the Buick car parked on the supermarket parking lot, and took the car. He said he kept extra sets of keys to the cars he sold. Gladen also testified that when he was talking to Weisberg on the telephone, that he told Weisberg he would hold the Buick car on his lot for thirty days in order to give Sterling an opportunity to get a new car warranty on the Chevrolet. Weisberg denied that Gladen told him this. On June 21, 1971, Gladen sold the Buick to one Paul Anderson for $3504.13.

Lummus and Parks both testified that on the Saturday when Sterling and Lummus signed the retail order form, that Sterling told them he had bought the Chevrolet as a new car, and that he had a new car warranty on it. Sterling denied that he ever told them any such thing. The warranty in question was customarily delivered by a car dealer to the purchaser of a new car, and covered five years or 50,000 miles, which ever came first. Sterling's Chevrolet had 41,000 miles on it, and if he had had a warranty, it would have covered him only 9000 more miles. Winters, a disinterested witness, testified that having such a warranty would be worth about $100.00 to a car such as Sterling had. Roy Gladen testified that such a warranty would make Sterling's car worth $300.00 more; whereas Lummus testified the warranty would make Sterling's Chevrolet worth $300.00 to $500.00 more.

However, the NADA handbook, used as a guide by car dealers for various makes and models of used cars in average condition throughout the country, does not take into consideration the existence or not of a new car warranty in arriving at the value of a given make and model of used car. In other words, this handbook published by the National Automobile Dealers Association considers a number of factors in arriving at the value of any given make and model of a used car, but whether such car has a new car warranty is not considered. Significantly, there was nothing in the written Retail Order Form signed by Sterling and Lummus to the effect that Sterling had agreed to furnish a warranty on the Chevrolet. The other aspects of the trade were set out in this form, but no mention of a warranty is made. The form does recite, however, "Purchaser agrees that this Order includes all the terms and conditions on both the face and reverse side hereof, that this Order cancels and supersedes any prior agreement and as of the date hereof *comprises the complete and exclusive statement of the terms of the agreement* relating to the subject matters covered hereby; ——." (emphasis supplied). Moreover, when Lummus called Winters (the finance company man) on the telephone on Saturday, May 15, 1971, to give him the details of the trade, he made no mention to Winters about Sterling furnishing a warranty on the Chevrolet.

Roy Gladen testified that Lummus had no authority to sign the "Retail Order for Motor Vehicle" forms, and that he "reprimanded" Lummus when he learned Lummus had signed it on Sterling's trade. Gladen testified that he had been out of town and returned on the afternoon of Monday, May 17, 1971, and learned of this Sterling deal. Lummus informed Gladen of the details of the trade at this time.

■ It should be pointed out that none of the jury's findings were challenged by Appellant except Special Issues 12 and 13, relative to the exemplary damages. By the unchallenged findings it is established: (1) that Plaintiff and Defendant had made a

firm agreement to trade cars on Saturday, May 15, 1971, subject only to exchanging car titles and payment of the $1400.00 on the following Monday, May 17, 1971; (2) that on the following Monday, the Plaintiff offered to pay the $1400.00 difference and complete the transaction; but (3) Defendant on that same Monday refused to deliver title to the Buick, or to accept payment of the $1400.00 difference; (4) that on Wednesday, May 19, 1971, Plaintiff was in possession of the Buick, at which time the Defendant wrongfully took the Buick and converted it to its own use and benefit.

Moreover, and significantly, the jury failed to find (1) that Sterling on Saturday, May 15, 1971, represented to Defendant that he had purchased the Chevrolet new, or that he had a new car warranty on said car, and (2) that the agreement was conditioned upon Sterling delivering a new car service warranty, and (3) that after the taking of the Buick, Defendant notified Plaintiff's attorney that it would hold the Buick a reasonable time in order to give Plaintiff time in which to secure a warranty.

In summary, the jury believed Sterling's testimony and that of his attorney, and did not believe the Defendant's version of what happened. Since the wrongful conversion facts are established by jury findings and are not challenged, the problem before us is whether there is any evidence of probative value to support the jury's findings (1) that the conversion was wilful and malicious, and (2) whether Plaintiff should be awarded $5000.00 exemplary damages. We hold the evidence to be ample to support such findings. The next question before us is whether the jury's answers to Special Issues 12 and 13 (the exemplary damage issues) are so against the great weight and preponderance of the evidence as to be manifestly unjust. In answer to this, we hold that the jury's findings to those issues are not against the great weight and preponderance of the evidence.

From the record before us, the jury had the right to infer and conclude that (1) Lummus and Parks had made a bad deal for their employer; (2) that when Roy Gladen found out about it he was unhappy and wanted the deal rescinded; (3) that in order to protect themselves, Lummus and Parks fabricated the testimony relative to Sterling's alleged agreement to furnish the warranty, and tried to get Sterling to agree to call off the trade; (4) that failing in this, Roy Gladen, without making any effort to get Sterling's side of the story, or without resorting to any legal recourse, wrongfully took the car away from Sterling's possession. In other words, the jury had a right to infer that the Defendant, and its president and salesman tried to back out of a bad deal by conspiring against the Plaintiff; and having failed to accomplish their purposes in this manner, wrongfully took the car away from the Plaintiff when he was not present to prevent them from doing so.

■ Exemplary damages may be awarded in addition to compensatory damages where a Defendant is shown to have acted wilfully or fraudulently. *Pan American Petroleum Corp. v. Hardy* (Waco CA 1963) 370 S.W.2d 904, error refused NRE; *Big Town Nursing Home, Inc. v. Newman* (Waco CA 1970) 461 S.W.2d 195, no writ; *First Security Bank & Trust Co. v. Roach* (Dallas CA 1973) 493 S.W.2d 612, error refused NRE; *Tennessee Gas Transmission Co. v. Moorhead* (Beaumont CA 1966) 405 S.W.2d 81, error refused NRE.

■ Our Supreme Court has held that exemplary damages may properly be awarded when the Plaintiff has suffered actual damage as the result of fraud intentionally committed for the purpose of injuring him. See *Dennis v. Dial Finance & Thrift Co.* (Tex.Sup.Ct.1966) 401 S.W.2d 803, and the cases therein cited at page 805. Also see *Bond v. Duren* (Waco CA 1975) 520 S.W.2d 460, error refused NRE.

■ In the case at bar, we hold that the evidence shows that the Defendant wrong-

fully, wilfully, and with gross indifference to the Plaintiff's rights, took the Buick automobile from Plaintiff's possession and converted same to Defendant's own use and benefit, and that the trial court's judgment for exemplary damages based upon the jury verdict was therefore proper.

Appellant's remaining three points, being 6, 7, and 8, assert error of the trial court in overruling Appellant's motion for mistrial, occasioned by statements made by Plaintiff-Appellee's counsel in the presence of the jury.

This case had been once before tried before a jury, and resulted in a mistrial.

At the beginning of the second trial (which is the trial now before this court on appeal) Plaintiff-Appellee's counsel made a request in the presence of the jury to have the transcript of the first trial put in the record. Defendant-Appellee made a motion for mistrial which was overruled by the trial court.

Then later on in the trial, Plaintiff-Appellee's counsel, Mr. Weisberg, testified concerning the attorney's fees rendered by him in behalf of Plaintiff, in support of his plea for exemplary damages. Concerning these matters, he testified to the nature of services performed by him and time spent by him in connection with the previous trial as well as the current trial, including a possible appeal from the current trial. In conclusion, he testified that the reasonable value of these legal services amounted to $8500.00. In recounting his services in the previous trial, counsel testified, "There were a number of pleadings filed, a motion for judgment, which was granted to the Plaintiff; a motion for judgment notwithstanding the verdict of the jury, which was denied." Defendant again moved for a mistrial, which was overruled by the trial court.

■ There was at no time before the jury any testimony concerning what the verdict of the previous jury was, except for the possibility that the jury might have been able to ascertain from counsel's testimony concerning the motions, that the previous verdict was favorable to Plaintiff. We have carefully reviewed the record, and hold that the acts and statements of Plaintiff's counsel complained of constituted harmless error, and did not amount to such a denial of the rights of the Appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment. Rule 434, Texas Rules of Civil Procedure. This is true particularly in view of the fact that the jury was not informed of what the previous jury verdict or judgment was. See *Federal Underwriters Exchange v. Bickham* (Tex.Sup.Ct.1941) 138 Tex. 128, 157 S.W.2d 356.

All of Appellant's points have been carefully considered, and are overruled. Judgment of the trial court is accordingly affirmed.

Affirmed.